SHAFFER TOOL WORKS and Raymond W. Walker, Plaintiffs,

v.

JOY MANUFACTURING COMPANY and Charles D. Crickmer, Defendants.

Civ. A. No. 71–H–1278.

United States District Court, S. D. Texas, Houston Division.

Dec. 16, 1976.

William Poms and Louis J. Bovasso, Poms, Smith, Lande & Glenny, Los Angeles, Cal., and James F. Weiler, Fulbright & Jaworski, Houston, Tex., for plaintiffs.

Raymond G. Hasley, Rose, Schmidt & Dixon, E. W. Breish, Joy Manufacturing Co., Pittsburgh, Pa., and Chilton Bryan, Houston, Tex., for defendants.

## MEMORANDUM OPINION

SEALS, District Judge.

This long, involved and difficult cause of action is before the Court for the rendering of an opinion in Plaintiffs' appeal from a decision of the Board of Patent Interferences (hereinafter the Board) in the United States Patent and Trademark Office under 35 U.S.C. § 146. The case was tried to the Court on the issue of priority of invention and the Court is of the opinion that Plaintiffs should prevail in all respects.

Certain Admissions of Fact were made by the parties in the Pretrial Order which pertain principally to the history of the patents in this case and they are accepted by the Court as admitted for all purposes.

In the patent office proceedings below there were four claims in the original patent of Walker (hereinafter Plaintiff), and in the decision from which this appeal was taken. Claims 1–3 were awarded to Plaintiff and Claim 4 was awarded to Crickmer (hereinafter Defendant). Plaintiff appealed that decision to this Court seeking the reversal of only Claim 4 under 35 U.S.C. § 146. Plaintiff claims that the Board was incorrect in its ruling on Claim 4 and that its finding of new matter in Plaintiff's patent was erroneous. Defendant claims that not only was there new matter as to Claim 4 but that Claims 1–3 should be reversed on the ground of fraud.

The questions before this Court go to priority of invention, not patentability. The issues of fraud and new matter concern the written contents of the patent applications and in particular certain drawings. Plaintiff invented a device known as a pressure balanced bumper sub which is used as one component in an oil well drilling string, and intended for use in undersea operations from a floating platform. The function of the bumper sub is to extend and retract as a result of internal pressure while maintaining a constant force on the drill bit thus allowing drilling operations to continue.

Prior to Plaintiff's invention all bumper subs were subjected to great forces from drilling mud under pressure which caused the bumper sub to become extended, and this configuration resulted in a "pump open effect." The forces operated within the bumper sub which is comprised of an outer barrel and an inner mandrel through which the fluid is pumped. The mandrel is the smaller diameter inner component which acts like a piston in a cylinder, and the barrel corresponds to the cylinder. There resulted a differential between the pressure on the interior of the sub and that on the exterior, the latter being the space within the drill hole outside of the sub and in which the drilling mud is pumped back to the surface. The pressure differential acted on the bottom circular area of the mandrel causing the bumper sub to extend fully and remain extended by the pump open force, thus the sub became rigid and lost its ability to extend and retract. This position of rigidity was said to cause the telescopic action of the sub to be "locked out."

When the sub became "locked out," the drilling string was susceptible to cracking because of the rigidity of the system, and drilling operations effectively stopped during the period of lock out. Plaintiff's refinement of bumper sub operation solved this problem by adding a second piston to that of the original bumper sub. This second piston absorbed the pressure differential by producing a force in a direction opposite to the pump open force. If the areas against which the pressures act are relatively equal then the forces will also be relatively equal and the sub will be "balanced." This second piston is contained in an annular chamber between the mandrel and barrel indicated by reference number 25 on Figure 2b of Plaintiffs' Exhibit (hereinafter PX1) which is a copy of the patent in suit. The annular chamber is sealed so that fluid can only enter at one point connected to the interior of the mandrel, and this chamber may be referred to as the high pressure chamber. A second chamber appears as reference numeral 26, and it is also formed below the annular flange or second piston between the mandrel and the barrel. The second chamber is also sealed except for its connection to the exterior of the sub where the low pressure fluid is located. The resulting pressure differential across the flange is the same as that which acts upon the entire circular area at the bottom of the mandrel which produces the pump open effect.

A question arose during the trial as to exactly what area was being acted upon by the high pressure fluid. The Court finds that Plaintiffs are correct in their assertion that the high pressure fluid acts at the bottom of the mandrel to produce the pump open effect. Although the bottom of the

mandrel is in fact an open tube, the Court finds that Plaintiffs are correct in their assertion that in accordance with principles of hydrodynamics the area upon which the fluid acts is not merely the annular rim of the tube but is actually the entire circular area of the tube. For purposes of force analysis the system may be viewed as if the bottom of the mandrel were capped rather than open.

After Plaintiff invented this innovative and useful pressure balanced bumper sub, as opposed to prior ordinary bumper subs, Plaintiff filed his patent application, Serial No. 274,485, on April 22, 1963 and that application matured into United States Patent No. 3,329,221 which was issued on July 4, 1967. This original parent application was initially rejected on all counts as unpatentable. Px–19 at 26–27. Plaintiff then amended the application, *Id.* at 29–39, and it was again rejected. *Id.* at 41–43. This process of amendment and rejection continued and at one point Plaintiff attempted to convince the Patent Examiner, James A. Leppink, that the disclosure was adequate and patentable, that certain areas crucial to the pressure balancing capabilities of Plaintiff's bumper sub were properly shown on the patent drawings, and that this was substantiated in the affidavit of Chester B. Falkner. *Id.* at 55–59 and 112–117. Plaintiff further suggested to the Examiner that scaling of the relevant section, Figure 2b of the drawings, would show the proper spacial relationships.

Following the rejections of his original application Plaintiff filed a continuation application which included the original drawings. PX–19A. This application, serial number 559,698, filed on March 21, 1966, matured into the patent involved in this suit. The fact that Plaintiff called this application a "continuation" created an issue litigated in this Court. A continuation is defined, in part, as follows:

> A continuation is a second application for the same invention claimed in a prior application and filed before the original becomes abandoned. Except as provided in Rule 45, the applicant in the continu-

ing application must be the same as in the prior application. The disclosure presented in the continuation must be the same as that of the original application, i. e., the continuation should not include anything which would constitute new matter if inserted in the original application.

Manual of Patent Examining Procedure, § 201.07, 6 Deller's Walker on Patents Appendix V at 251 (2d Ed. 1972). It is in this regard that questions were raised of whether or not there was "new matter" and whether or not Plaintiff was entitled to the earlier filing date.

At this point in the patent application history the present controversy begins to take shape. Claims 1–3 of the continuation application were allowed by the Patent Examiner, and Claim 4 was objected to on the basis of inadequate description based on the drawings. PX–19A at 24–25. In response to the objection Plaintiff submitted that his specifications in Claim 4 were adequate especially in regard to Figure 2b. *Id.* at 26–28. Plaintiff asserts, and the Court agrees with him, that he had the right to amend his specifications and claims to conform to his drawings during the pendency of his application in the Patent Office. The Examiner stated that "[i]t is necessary that the specification be amended to include a description of the claimed structure as it is shown in the drawings." *Id.* at 24–25. An Amendment was submitted, *Id.* at 26–28, and it appears from the face of PX–19A that all four of Plaintiff's claims were then allowed. The initial phase of Plaintiff's patent application proceedings is then complete with the favorable decision, and it is here that Defendant's history may be considered.

On June 5, 1964, over a year after the filing date of Plaintiff's patent application, PX–19, Defendant filed an application on a Drilling Device, Serial No. 372,856. PX–20. All of Defendant's claims were rejected on the basis of prior art references. *Id.* at 24–25. Defendant amended, *Id.* at 27–37, some of his claims were allowed, *Id.* at 39–40, and the rest were rejected. Defend-

ant amended again, *Id.* at 41–51 and 59–63, seeking a reconsideration of what was otherwise a final rejection. This rejection was withdrawn, *Id.* at 65–67, Defendant again amended submitting new drawings, *Id.* at 68–78, and on July 12, 1967 Defendant was informed by the Patent Office of the existence of the Walker patent involved in this suit. *Id.* at 85.

It was after Defendant had an opportunity to study Plaintiff's patent that he challenged it arguing that the material added by Plaintiff to his second-filed application, PX–19A, was "new matter" with respect to the earlier application. PX–19. However, Defendant was again unsuccessful and his claims were rejected, PX–20 at 95–97, but he sought reconsiderations and extensions of time, *Id.* at 101–102, which he received. *Id.* at 103. Defendant then submitted a new claim similar to Claim 4 of Plaintiff's patent, *Id.* at 104–118, but this was also rejected. *Id.* at 119–121. Defendant's next stratagem was to copy all four of Plaintiff's claims, *Id.* at 122–128 in order to provoke an interference between Plaintiff's patent and Defendant's application. Such an interference was declared by the Patent Office on October 10, 1968. *Id.* at 173 and PX–2. Defendant then filed his Preliminary Statement, PX–14, claiming a reduction to practice between June 21 and July 1, 1963.

After Defendant's unsuccessful attempts to prove priority he moved to dissolve the interference as to the four claims on the ground that Claim 4 was a separate and distinct invention which was not entitled to the filing date of Plaintiff's parent application due to the introduction of new matter. Defendant wanted the interference to be re-declared but only as to Claim 4. Following this move by Defendant, Plaintiff, on October 17, 1969 filed a petition for "Public Use Proceedings" in the United States Patent and Trademark Office. PX–16. Plaintiff there showed use of the invention by his assignee, Plaintiff Shaffer Tool Works, more than a year before the filing date of Defendant's application. Plaintiff then moved to stay the interference pending a ruling in the Public Use Proceedings. PX–17, and that motion was denied. PX–18. Defendant also filed a Motion to Shift the Burden of Proof, but only as to Claim 4 in the interference, on the ground that Plaintiff could not support Claim 4. The Board of Interferences denied this motion as well. PX–3.

On September 14, 1971, the Board of Patent Interferences issued its decision awarding Claims 1–3 to Plaintiff and Claim 4 to Defendant. PX–9. It appears that the Board's decision to split the award was based on an acceptance of Defendant's argument that Plaintiff introduced new matter into his second patent application. This decision is that from which Plaintiffs are appealing and it concludes the basic history of this cause of action.

*Scope of Review*

It is axiomatic that the jurisdiction of a federal court is limited, and the rule as to the particular limitations imposed on this Court in the instant action is as follows:

An action under [35 U.S.C.] § 146 is of a hybrid nature. It has one element of a trial de novo in that either party is permitted to introduce evidence which was not before the Board. Nevertheless, it is clear under the controlling case of *Morgan v. Daniels*, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894), that a § 146 action is essentially of an appellate character and that the scope of review is quite narrow:

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, *unless the contrary is established by testimony which in character and amount carries thorough conviction.*" *Id.* at 125, 14 S.Ct. at 773 (emphasis added).

*Rex Chainbelt, Inc. v. Borg-Warner Corp.*, 477 F.2d 481, 484 (7th Cir. 1973) (footnote omitted). *See also Frilette v. Kimberlin,*

508 F.2d 205, 211 (3d Cir. 1974), *cert. denied*, 421 U.S. 980, 95 S.Ct. 1893, 44 L.Ed.2d 472 (1975). Therefore, since a trial de novo has been held it remains for the Court to examine the decision of the Board on the four claims. That opinion was offered into evidence at the trial, PX–9, and may be examined in two parts: one relating to Claims 1–3, and one relating to Claim 4.

*Claims 1–3*

■ As the history of the patents outlined above indicates, there was and still is no question that Plaintiff filed his first application before Defendant. Therefore, in the proceeding before the Board Plaintiff was made the senior party and Defendant the junior party. As the Board stated, "[e]ach party is relying solely upon his record date . . . [and Defendant] as junior party has the burden of proof on the issue of priority of invention." PX–9 at 2. The Board then stated its basic decision as follows:

> We find that the disclosure in the parent application of Walker does *not* provide clear and adequate support for the language of count 4 and hold, accordingly, that he is *not* entitled to the benefit of the filing date thereof, April 22, 1963, for priority purposes as to that count. We find, further, that the allowance of the claims corresponding to counts 1–4 was *not* obtained due to fraud on the Patent office and we hold accordingly that Crickmer is *not* entitled to prevail as to any of the counts on this basis.

*Id.* at 3. Thus, the Board gave little credence to Defendants' claims of fraud, and this Court is in agreement with that holding. Defendants have presented no substantial evidence of fraud, nor any other ground on which to overturn the Board's decision as to Claims 1–3. Therefore, in accordance with the rule previously stated concerning the scope of review in this Court, it is the opinion of the Court that Claims 1–3 were properly awarded to Plaintiff, and that the evidence offered by Defendants was insufficient to overcome the presumption of correctness of the Board's decision.

*Claim 4*

Claim 4 differs from Claims 1–3 in that the latter express the invention in relatively broad terms whereas the former is directed to a specific embodiment of the invention involving "virtually equal" areas. The Court is of the opinion that the Board in their award of Claim 4 to Defendant erred on a number of grounds.

■ The decision of the Board was substantially based on a finding of "new matter" which this Court holds to be clearly erroneous. The phrase "new matter" is a term of art in the world of patent law, and in this case it goes to the question of whether or not the patent drawings in the parent application may be relied upon as an original disclosure for the claimed subject matter in the parent application. On this question Plaintiff cites as controlling and the Court accepts therefor the case of *Application of Wolfensperger*, 302 F.2d 950, 49 CCPA 1075 (1962), where it was held as follows:

> Patent Office Rule 118 authorizes, by implication at least, the amendment of the words in the written specification so as to add statements not originally contained in it to *conform* to originally filed drawings.

*Id.* at 955. From this decisional authority the Court finds that the test of whether "new matter" exists is by reference to the written description and the drawings filed in the application. Here the Patent Examiner recognized that there was adequate support in the original drawings for the claim added in the continuation application and approved the addition of the statements in the written description which conformed to such drawings. Plaintiff had the right to amend his specifications and claims to conform to his drawings during the pendency of his application, and during the prosecution of the continuation application Plaintiff was requested to do so by the Patent Examiner. This procedure is proper under 35 U.S.C. § 142 and Patent Office Rule 118. *Hadco Products, Inc. v. Lighting Corp. of America, Inc.*, 312 F.Supp. 1173,

1182–83 (E.D.Pa.1970), *vacated on other grounds,* 462 F.2d 1265 (3d Cir.), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 464, 34 L.Ed.2d 315 (1972). Therefore, the Board was incorrect in its findings of new matter and it further erred in not deferring to the expertise of the Patent Examiner.

When the Board had before it the findings in favor of Plaintiff made by the Patent Examiner, and the ruling by the Examiner that Plaintiff should be allowed to amend, the Board should have accepted that finding which this Court now does. "Such a determination, it is said, is entitled to special weight and should not be disturbed unless clearly erroneous." *Hadco, supra* at 1182. Therefore, this Court finds that the Board erred in not deferring to the expertise of the Patent Examiners on any question of "new matter."

Inasmuch as this Court has found that the Board erred in not deferring to the Examiner and in the finding of new matter, the next question is whether the drawings in Plaintiff's original application disclosed to one having ordinary skill in the art, considered in light of the specification, the virtually equal concept.

Before any discussion of the teachings of the drawings, it might be noted that the Board held that patent drawings are not generally "drawn to scale and are not so intended." PX–9 at 11. The Board cited no authority for this statement, and the statements of two witnesses, Joseph F. Woerner, and George Manias, lead this Court to conclude that patent drawings certainly may be and usually are drawn to scale. When drawings and specifications conflict, then it is the language of the latter which controls. *Johnson v. Riener,* 302 F.2d 757, 761, 49 CCPA 1096 (1962). However, it has also been held that "a patent drawing does not have to be to any particular scale." *Application of Reynolds,* 443 F.2d 384, 389, 58 CCPA 1287 (1971). The Court in *Reynolds* then went on to hold that where drawings would have to be significantly distorted "not to produce a device which would inherently perform the recited function" then "a person skilled in the art would

suspect that there was some reason for the relationships shown in the drawing and would not regard such disclosure as accidental or arbitrary." *Id.* Therefore, this Court finds that as a general rule the drawings accompanying an application for a patent for an apparatus or machine are drawn to scale. Furthermore, the drawings in Plaintiff's application were prepared from an engineering blueprint and were intended to represent the areas in question to scale in that one diameter dimension bore a certain relationship to another. PX–8 at 17–19. Therefore, while Figures 6 and 7 may have been exaggerated to show one or more aspects of the invention, Figures 2a and 2b were prepared by a patent draftsman under Plaintiff's supervision to represent the areas in question here to scale.

The next question is whether or not one having ordinary skill in the art, having both the drawings and written description before him, could make and use the invention. 35 U.S.C. § 112. Plaintiff claims, and this Court finds, that his original written description and drawings clearly disclosed his invention to one of ordinary skill in the art.

> The practical, legitimate enquiry in each case of this kind is what the drawing in fact discloses to one skilled in the art. Whatever it does disclose may be added to the specification in words without violation of the statute and rule which prohibit "new matter," 35 U.S.C. § 132, Rule 118, for the simple reason that what *is* originally disclosed cannot be "new matter" within the meaning of this law. If the drawing, then, contains the necessary disclosure, it *can* "form the basis of a valid claim."

*Application of Wolfensperger,* 302 F.2d at 955. In accordance with this rule of law and based upon the facts developed at the trial, this Court finds that the drawings when read in the light of the written description and when shown to one having ordinary skill in the art disclose a pressure balanced bumper sub which could be produced and made to function as Plaintiff originally intended. Even though the writ-

ten description of the original application did not explicitly state that the area of the mandrel end and the annular area of the high-pressure chamber were equal, the written description did point out what was the purpose of the device, what elements of the structure contributed to carrying out such purpose, and what areas that were exposed to pressure-created forces had to be balanced in order to obtain a workable tool. Thus, the written description could be conformed to the drawings, and the purpose of the material added in the application which matured into the patent in suit was merely to point out an inherent feature of Plaintiff's tool which feature was adequately disclosed and illustrated in the parent application. The Court makes these findings from the exhibits submitted and in particular from the credible evidence adduced from the witnesses of both parties.

 The next question is whether or not the Board erred in not considering expert testimony, and this Court finds that it did so err. From the exhibits and credible evidence submitted the Court finds that the Board erred in this regard because they did not adequately comprehend the invention disclosed in Plaintiff's application. The Board stated the following in its decision:

In the next sentence Walker recognizes that these forces may differ and discloses that the difference "would favor the force tending to move the mandrel 17 downwardly." He then discloses that such motion would be resisted by the "force acting at the mandrel end 36." Such latter force, as a matter of elementary physical laws relating to hydraulics or hydrostatics, is the result of the pressure acting perpendicularly to the annular, metal end surface area of the mandrel 17. Walker then discloses that the downward force, resulting from the high pressure effect on area 27, will "virtually equal the upward *forces* i. e., the force resulting from the ambient environmental pressure effect on area 28 *plus* the force resulting from the high pressure effect on the annular metal end surface of mandrel 36. *This* results in "putting the . . . bumper sub in static equi-

librium." Compare original claim 1 which refers to the "effective area of said mandrel lower end."

PX–9 at 14. From the credible evidence presented at the trial, in particular the testimony of Plaintiff's witness, Wiley B. Noble, this Court finds that the Board was incorrect in its understanding of the tool. The pressure differential in question here acts upon the circular area at the bottom of the mandrel which produces the pump open effect. The Board was confused as to which area the fluid acted upon to produce the pump open effect. The Court finds that even though the bottom of the mandrel of Plaintiff's sub is an open tube, in accordance with the applicable principles of hydrodynamics the area upon which the fluid acts is not merely the annular rim of the tube as stated by the Board, but is really the entire circular area of the tube. It is as if the bottom of the mandrel were capped, thus since the high-pressure chamber is arranged such that the force on the piston-like flange between the high and low-pressure chambers is in a direction opposite to the pump open force on the bottom of the mandrel, a balance is produced. Therefore, the Board should have relied on expert testimony as an exception to the general rule that expert testimony is not considered in interference proceedings. PX–9 at 8–12.

On the question of fraud, the Board held in Plaintiff's favor, and as noted above in regard to Claims 1–3, the Board is presumed to have decided the point correctly absent strong proof to the contrary. The Court finds that the Board erred in a number of respects as to Claim 4, but not in their decision on the question of fraud. PX–9 at 19–22. Thus, this Court agrees with and affirms the ruling of the Board on the issue of fraud and finds from the credible evidence that Plaintiffs practiced no fraud at any point in the proceedings below.

Therefore, this Court concludes that the Board erred in a number of substantial respects in the awarding of Claim 4 to Defendant. These errors require a reversal of that portion of their opinion and a hold-

ing by this Court that Plaintiff set forth an adequate disclosure with no use of improper new matter.

*Reduction to Practice*

 Plaintiff claims and the Court so finds that he conceived and actually reduced his invention to practice before the filing date of Defendant's application. Plaintiff himself testified and the Court finds that a bumper sub was built in accordance with the teachings of Plaintiff's invention, sold to, and used successfully by Shell Oil Company prior to the filing date of Defendant's application. This is also corroborated in the depositions of Chester B. Falkner, Jr., PX–13 at 19–20, Charles R. Gurganus, PX–11 at 17–18, and Fines F. Martin, PX–35 at 8–10. The Court also makes these findings from the testimony of Joseph F. Woerner, and Defendants did not adequately refute any of this evidence. Rather, Defendants claim that Plaintiffs should not be allowed to introduce this evidence of actual reduction to practice because it was allegedly not before the Board.

This Court had occasion in a prior order in this case to rule on the admissibility of evidence relating to issues before the Board. *Shaffer Tool Works v. Joy Manufacturing Co.*, 388 F.Supp. 536 (S.D.Tex. 1974). "[T]he evidence before the district court may only relate to those issues presented to the Board of Patent Interferences, even though the evidence is new, but evidence withheld from the Board is generally inadmissible in the district court." *Id.* at 538 (citations omitted). In accordance with that ruling this Court is now in a position to state "whether or not the issue of Walker's actual reduction to practice was ever before the Board," *Id.*, and the Court finds that such evidence was indeed before the Board. Plaintiffs did not conceal or suppress evidence, and certain instruments involved in the Public Use Proceeding were before the Board as shown by receipt stamps. PX–16. The Board had this information before it and erred in not finding that Plaintiff had conceived and reduced his invention to practice. While Plaintiffs

state that the issue of public use and reduction to practice were not focused on before the Board, the Court finds that these issues were at least available to the Board for consideration, and this Court is exercising its discretion to hear them in this forum. *Standard Oil Co. v. Montedison, S. p. A.*, 540 F.2d 611, 617 (3d Cir. 1976). Therefore, the evidence was admissible in this Court and Defendants' Motion to Strike Testimony should be and hereby is denied.

In conclusion, the Court is of the opinion that the Board of Patent Interferences was correct in awarding Claims 1–3 to Plaintiffs and was in error in awarding Claim 4 to Defendants, that the opinion of the Board should be accordingly affirmed in part and reversed in part, and that a Final Judgment so stating should be issued by this Court.

The Clerk shall file this Memorandum Opinion and provide all parties with a true copy.